The **UPPER DECK COMPANY,**
**et. al., Plaintiffs,**

v.

**AMERICAN INTERNATIONAL SPE-CIALTY LINES INSURANCE COMPANY, Defendant.**

**No. 05CV1945 IEG (RBB).**

United States District Court,
S.D. California.

June 28, 2007.

Duke F. Wahlquist, Richard Keith Howell, Rutan & Tucker, LLP, Costa Mesa, CA, for Plaintiffs.

Peter A. Stroili, Robert E. Kushner, D'Amato and Lynch, New York City, R. Gaylord Smith, Ernest Slome, Lewis Brisbois Bisgaard and Smith, San Diego, CA, for Defendant.

## ORDER [1] LIFTING STAY, [2] GRANTING DEFENDANT'S MOTION TO CONFIRM ARBITRATION AWARD and [3] DENYING PLAINTIFFS' MOTION TO VACATE ARBITRATION AWARD

[Doc. Nos. 17, 37]

GONZALEZ, Chief Judge.

Presently before the Court is Upper Deck's and Richard P. McWilliam's (collectively, "plaintiffs") motion to vacate an arbitration award in favor of American International Speciality Lines Insurance ("AISLIC"). (Doc. No. 17.) AISLIC has filed a cross-motion to confirm the same arbitration award, which declared that plaintiffs were entitled to no coverage under AISLIC's policy. (Doc. No. 37.) For the reasons stated below, the Court confirms the arbitration award in favor of AISLIC and denies plaintiffs' motion to vacate the award.

## BACKGROUND

### A. Factual History

The KPMG accounting firm developed the Subchapter S Charitable Contribution Strategy (SC2) in the early '00s to enable S corporations to reduce tax liability. (Pls. Memo. ISO Motion to Vacate, at 4.) In the typical SC2 transaction, the S corporation issues shares of nonvoting stock to its shareholders, who then donate the stock to a tax-exempt entity. (Pls. Exhibit F (I.R.S. Bulletin 2004–17), at 115.) The number of nonvoting shares is nine times the number of voting shares, such that the parties can claim the tax-exempt entity owns ninety percent of the S corporation's stock. (Id.) The S corporation then allocates ninety percent of its income to the tax-exempt party. (Id.)

Upper Deck, an S corporation, has one shareholder—the MPR Trust, of which McWilliam is the sole beneficiary. (Pls. Memo. ISO Motion to Vacate, at 5.) Upper Deck purchased SC2 from KPMG in March 2001. (Id. at 6.) On May 2, 2001, in conjunction with the sale of SC2 to Upper Deck, KPMG issued a series of opinion letters regarding the tax consequences of the SC2–implementing transactions. (See Pls. Exhibit B, at 32–53.) On March 29, 2001, Upper Deck issued 8.28 million shares of non-voting common stock to the MPR Trust, which, in turn, donated those shares to the Austin Firefighters Relief Fund ("charity").[1] (Pls. Memo. ISO Motion, at 6.) Fair Market Value, Inc. appraised those shares at a fair market value of $1,357,920 as of March 31, 2001. (Id.; Policy, Exhibit E.) The SC2 strategy contemplated that Upper Deck would allocate 90% of its income to the charity, which would pay no taxes on that income. (Pls. Exhibit F, at 115–16.) The MPR Trust would likewise not pay taxes on income allocated to the charity.

The MPR Trust and the charity also entered a Shareholders Agreement, which, inter alia, prescribed the conditions under which the charity could resell the shares to the MPR Trust or otherwise transfer them. (See Pls. Exhibit B, at 56–73.) The Shareholders Agreement included three specific provisions on resale. Under § 2.1, where the charity sought to transfer the shares to a "bona fide, good faith purchas-

---

1. Upper Deck then issued "warrants" to purchase 82.8 million shares of additional non-voting common stock. The warrants would enable the shareholders to dilute the charity's ownership interest in the corporation, if the charity refused to resell its shares back to the corporation prior to any income distribution to shareholders.

er", Upper Deck had a right of first refusal to purchase the shares on the same terms.[2] (Pls. Exhibit B, at 57.) Under § 3.5, upon the occurrence of any specified "Disposition Event" (*e.g.*, if the charity filed for bankruptcy), Upper Deck or its shareholder could repurchase the shares at fair market value. (*Id.* at 60.) Finally, under § 5.2, during a six-month window beginning April 1, 2003, the charity could resell all of its shares back to Upper Deck for fair market value. (*Id.* at 65.) Otherwise, § 1 prohibited the charity from otherwise disposing of the shares without the prior written consent of Upper Deck and the MPR Trust. (*Id.* at 56.)

AISLIC drafted a Fiscal Event Insurance Policy ("Policy") to cover tax liabilities associated with the SC2 strategy. (*See* Pls. Exhibit B, at 1–26.) On August 29, 2001, AISLIC issued the Policy to plaintiffs for a premium of $3.25 million. (Policy, at ii.) The Policy carried a coverage limit of $50 million. (*Id.*) The Policy incorporated the KPMG opinion letters; the Shareholders Agreement; Upper Deck's September 4, 2001 Representation Letter; the warrant agreement; and the share appraisal. (Award, at 3.)

In 2002, Congress and the IRS began investigating the SC2 strategy. (Pls. Memo. ISO Motion, at 8–9.) The IRS issued summonses to KPMG to obtain a list of SC2 participants, and implemented a voluntary disclosure initiative. (Wahlquist Decla. ¶ 7.) The California Franchise Tax Board (FTB) implemented a similar initiative. (Pls. Exhibit H.)

At the end of 2002, Upper Deck approached the charity about repurchasing the non-voting shares. Pursuant to a share purchase agreement dated December 10, 2002, Upper Deck repurchased the shares for $2 million. (Pls. Exhibit C, at 89 (Share Purchase Agreement § 1. 1).) As appraised by Empire Valuation Consultants, the fair market value of the shares at the time of repurchase was $11.3 million (more than five times the actual repurchase price). (Trans., at 325:19–22.)

In Notice 2004–30 issued in April 2004, the IRS indicated it would challenge the tax benefits obtained from the SC2 strategy and possibly terminate a participating corporation's subchapter S status. (Pls. Exhibit F, at 115.) The IRS followed up with a Coordinated Issue Paper on November 8, 2004, explaining that it would disregard the transfer of stock to a tax-exempt party and disallow charitable deductions by the donating shareholder(s) for federal tax purposes. (Pls. Exhibit G, at 118.) A similar measure by the California Franchise Tax Board (FTB) required SC2 participants to amend their returns to allocate all S-corporation income back to the original shareholders. (Pls. Exhibit H, at 135.)

Participating in the voluntary disclosure initiatives, Upper Deck settled with the IRS for $80 million in back taxes and interest, and with the FTB for $17 million in back taxes and interest. (Pls. Memo. ISO Motion to Vacate, at 10.) After the settlement, Upper Deck turned to AISLIC for coverage of the back taxes and interest. In a letter dated July 9, 2004, AISLIC's counsel concluded the Policy may not cover the loss because the Shareholders Agreement required Upper Deck to repurchase the shares at fair market value (as determined by an independent appraisal), and there was no evidence to show that the fair market value of the repurchased shares in December 2002 was $2 million. (Pls. Exhibit D, at 102–08.) AISLIC requested further information on the details of the repurchase transaction. (*Id.* at 107–

---

**2.** If Upper Deck did not purchase the shares, the right of first refusal then fell to the voting shareholder(s)—here, the MPR Trust. Shareholders Agreement § 2.3.

08.) AISLIC finally denied coverage in a letter dated July 29, 2005. (*Id.* at 96–101.)

## B. Procedural History

On October 13, 2005, plaintiffs filed their complaint seeking a declaratory judgment that AISLIC must cover plaintiffs' "Insured Tax Loss" under the Policy terms. (Compl. ¶¶ 38–49.) Plaintiffs further alleged causes of action for breach of contract and tortious breach of the covenant of good faith and fair dealing. (*Id.* at 18.)

On February 1, 2006, this Court granted AISLIC's motion to compel arbitration and stayed the case, pending the outcome of arbitration. (Doc. No. 13, at 11.) The AAA panel held a hearing for seven days in October and November 2006. (Def. Opp. to Motion to Vacate, at 14–15.) The panel's January 6, 2007 award declared plaintiffs were not covered under AISLIC's Policy and were entitled to no insurance proceeds. (Award, at 4.) The panel denied AISLIC's counterclaims. (*Id.* at 4–5.)

On March 15, 2007, the Court issued notice of a hearing for dismissal for want of prosecution pursuant to Local Rule 41.1. (Doc. No. 15.) Plaintiffs moved to vacate the arbitration award on April 9, 2007.[3] (Doc. No. 17.) AISLIC filed a cross-motion to confirm the award on April 23, 2007. (Doc. No. 37.) AISLIC filed its opposition on May 10, 2007. (Doc. No. 42.) Plaintiffs filed their opposition on May 15, 2007. (Doc. No. 43.) Both parties filed replies on May 21, 2007. (Doc. Nos. 44–45.) After hearing oral argument on May 29, 2007, the Court took the matter under submission.

3. No party ever formally requested that the Court lift the stay imposed when it granted defendant's motion to compel arbitration.

## DISCUSSION

### A. Legal Standard

■ Within a year after an arbitration award is made, if any party to the arbitration applies for an Order confirming the arbitration award, the Court which compelled arbitration must confirm the award "unless the award is vacated, modified or corrected[.]" 9 U.S.C. § 9 (2005). Any party to the arbitration can likewise apply to vacate the award, *inter alia,* "[w]here the arbitrators exceeded their powers[.]" *Id.* § 10(a)(4). Arbitrators exceed their powers where, *e.g.,* the award is " 'completely irrational' or 'constitutes manifest disregard of the law.' " *Poweragent, Inc. v. Elec. Data Sys. Corp.,* 358 F.3d 1187, 1193 (9th Cir.2004) (quoting *Coutee v. Barington Capital Group,* 336 F.3d 1128, 1132–33 (9th Cir.2003)). When arbitrators are called to interpret a contract, their award must " 'draw[ ] its essence from the [parties'] agreement.' " *Coast Trading Co., Inc. v. Pac. Molasses Co.,* 681 F.2d 1195, 1197 (9th Cir.1982) (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)).

■ However, review of an arbitration panel's contract interpretation is highly deferential because "an award must be confirmed if the arbitrators even arguably construed or applied the contract and acted within the scope of their authority." *Barnes v. Logan,* 122 F.3d 820, 822 (9th Cir.1997); *Goodman v. CIBC Oppenheimer & Co.,* 131 F.Supp.2d 1180, 1183 (C.D.Cal.2001). An award that "draws its essence" from the parties' agreement is a "plausible interpretation" of that agreement. *Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc.,* 84 F.3d 1186, 1190 (9th Cir.1996);

Plaintiffs' motion to vacate was apparently a response to the Court's notice of hearing for dismissal for want of prosecution.

*Truesdell v. S. Cal. Permanente Med. Group,* 151 F.Supp.2d 1161, 1173 (C.D.Cal. 2001). Once the reviewing court finds that the award plausibly interpreted the contract, the court confirms the award without further inquiry. *Sovak v. Chugai Pharm. Co.,* 280 F.3d 1266, 1271 (9th Cir.2002); *see Garvey v. Roberts,* 203 F.3d 580, 588–89 (9th Cir.2000) (explaining an award should be overturned only if the award clearly did not interpret the agreement and instead carried out the panel's "whims or biases"). An erroneous finding of fact or conclusion of law is insufficient for vacatur. *Employers Ins. of Wausau v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 933 F.2d 1481, 1486 (9th Cir.1991).

**B. The Panel's Award**

At arbitration, AISLIC asserted four bases for a denial of coverage: (1) breach of warranties, (2) applicability of a Policy exclusion, (3) absence of an "insured loss", and (4) failure to comply with a condition precedent. (Award, at 1.) In issuing a declaration that plaintiffs were not entitled to coverage under the Policy, the panel did not specifically rely on any single theory. Instead, the panel held more generally that AISLIC insured a particular tax strategy, consisting of transactions that would, in the opinion of KPMG, successfully shelter income from taxation. (*Id.* at 3–4.) The panel further held that plaintiffs abandoned that tax strategy through transactions that "all but guaranteed the failure" of the tax shelter. (*Id.* at 3.) The panel emphasized that plaintiffs' December 2002 repurchase of the shares from the charity at a price below fair market value "materially impaired" the defense of the strategy before the IRS. (*Id.* at 4.)

Here, plaintiffs claim the panel implausibly interpreted the contract and manifestly disregarded the law by, *inter alia,* creating

a requirement that plaintiffs redeem the shares at fair market value. To determine whether the panel's interpretation is plausible, the Court considers each of AISLIC's four asserted bases for denying coverage.

**C. Analysis**

*1. Breach of Warranty*

By Representation Letter to AISLIC, Upper Deck warranted, "The facts, assumptions of fact, and understandings of fact set forth in the opinions of KPMG LLP ... were true and correct on the date of such opinions [May 2, 2001] and continue to be true and correct on the date hereof [September 4, 2001]." (Pls. Exhibit B, at 54.) According to the panel, Upper Deck's repurchase of the shares from the charity in December 2002 at a price below fair market value breached the warranty.

■ The KPMG opinion letters are deemed part of the Policy. Policy § 2(n); *cf. Bacchus Assocs. v. Hartford Fire Ins. Co.,* 766 F.Supp. 104, 108 (S.D.N.Y.1991) (holding that an explicit reference to another writing is sufficient to incorporate that writing into the contract)[4]. On May 2, 2001, KPMG issued an opinion letter on the tax consequences of the charitable contribution of non-voting common stock. (Pls. Exhibit B, at 37–38.) That opinion letter discussed, *inter alia,* the "second class of stock" rule. Subchapter S corporations must not have more than one class of stock. I.R.C. § 1361(b)(1)(D). An agreement for the purchase or redemption of stock does not create a second class of stock unless "[t]he agreement establishes a purchase price that, at the time the agreement is entered into, is significantly in excess of or below the fair market value of the stock." Treas. Reg. § 1.1361–1(1)(2)(iii)(2) (2001).

---

**4.** The Court cites New York case law because "[t]he construction, validity and performance

of this Policy shall be governed by the laws of the State of New York[.]" (Policy § 16.)

As applied to SC2, the opinion letter determined the strategy would likely satisfy the second class of stock rule because the right of first refusal and the put option required payment of fair market value. (Pls. Exhibit B, at 43.) KPMG specifically predicted Upper Deck "should prevail (70% or greater probability of success) if the IRS should raise the second class of stock issue." (Def. Appx., Exhibit 6, at 8.) In his testimony to the panel, Mr. Peter Lathrop, the head of AISLIC's tax department, affirmed "the element of fair market value was central to [the SC2 strategy] passing muster under the tax law." (Trans., at 230:16–24.)

The New York Court of Appeals (*i.e.,* the state's highest court) recently explained the process of contract interpretation:

> The court should construe the agreements so as to give full meaning and effect to the material provisions. A reading of the contract should not render any portion meaningless. Further, a contract should be read as a whole and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.

*Beal Sav. Bank v. Sommer,* 8 N.Y.3d 318, 324–25, 834 N.Y.S.2d 44, 865 N.E.2d 1210 (N.Y.2007) (internal quotations and citations omitted). Applied to these facts, the arbitration panel plausibly interpreted the Policy as a whole to deny Upper Deck coverage. The Policy insured a strategy that, according to KPMG, had at least a 70% chance of prevailing if the IRS raised the second class of stock issue. (Def. Appx., Exhibit 6, at 8.) The KPMG opinions, incorporated into the Policy, supported these conclusions with Policy provisions (*i.e.,* the right of first refusal and put option) which involved repurchasing the shares from the charity at fair market value. (Pls. Exhibit B, at 43.) The repurchase of the shares in December 2002 at less than one-fifth of their fair market value was not consistent with KPMG's description of a repurchase that would satisfy the IRS's second-class-of-stock rule.

■ Although no provision of the Policy explicitly articulates an obligation to repurchase at fair market value, the panel's award is a plausible reading of the KPMG opinions, which explained the right of first refusal and put option would not violate the second class of stock rule because either transaction would take place at fair market value. In particular, the panel's interpretation does not render meaningless Shareholders Agreement § 1, which Upper Deck cites as the authority for the December 2002 repurchase. The title of § 1 is "Restrictions Against Transfer". (Pls. Exhibit B, at 56.) Therefore, the panel reasonably construed the provision as a prohibition against the charity's transfer of shares to third parties without Upper Deck's and McWilliam's consent. *See Russell–Stanley Holdings, Inc. v. Buonanno,* 327 F.Supp.2d 252, 256 (S.D.N.Y.2002) (where the word "indemnification" appeared in the heading, court held the provision did not extend to a claim for breach of warranty, because such an extension would create inconsistencies with other contract terms). The KPMG opinions' failure to mention Shareholders Agreement § 1 supports the panel's conclusion that § 1 was not intended as an independent basis for Upper Deck to repurchase the shares from the charity.[5]

---

**5.** The panel's interpretation draws further support from McWilliam's voluntary IRS disclosure of April 22, 2002, which mentions the put option (including an explicit reference to fair market value, determined by an independent appraisal) as the only means of repurchasing the shares from the charity. (Pls. Exhibit E, at 109–110.) Importantly, this disclosure does not mention a repurchase under

By contrast, if § 1 authorized Upper Deck's repurchase of the charity's shares (as Upper Deck claims), such a reading would render meaningless KPMG's opinion that the SC2 strategy would not create a second class of stock. Interpreting the Policy to allow Upper Deck to repurchase the shares for less than 20% of the fair market value contradicts KPMG's conclusion that payment of fair market value is necessary to avoid the second-class-of-stock rule. Upper Deck's argument fails because it not only asks the Court to second-guess the panel's contract interpretation, but also proposes an alternative interpretation that is inconsistent with another part of the contract (*i.e.*, the KPMG opinion letter on the charitable contribution).

In the case on which Upper Deck most heavily relies, the arbitration panel was not charged with reconciling ostensibly conflicting provisions. Instead, the panel imposed a remedy that contradicted the clear directives of the contract. In *Coast Trading Co., Inc. v. Pacific Molasses Co.*, the contract for a purchase of peas gave the buyer two options if the seller breached: amending the contract to allow compliance, or cancelling the contract and demanding money damages. 681 F.2d 1195, 1198 (9th Cir.1982). Prior to arbitration, the buyer elected to cancel the contract and demand damages. *Id.* at 1196. The panel found the seller had breached, but extended the date of performance rather than awarding damages. *Id.* The Ninth Circuit vacated the award because it was "contrary to remedies provided in the contract and [therefore] beyond the authority of the arbitrators." *Id.* at 1198. In essence, the *Coast Trading* panel went outside the Policy. In this case, the Court agrees with AISLIC's contention at oral argument that there is "not a hint" the

panel went outside the Policy. Instead, where one portion of the Policy (*i.e.*, the KPMG opinion letter) emphasized the importance of Upper Deck's repurchasing the shares at fair market value, the panel plausibly construed another provision of the Policy, entitled "Restrictions Against Transfer" (*i.e.*, Shareholders Agreement § 1), not to authorize a repurchase at one-fifth of fair market value.

Nonetheless, because no Policy provision explicitly prohibits transactions below fair market value, Upper Deck urges the Court to resolve this perceived ambiguity in Upper Deck's favor by construing the Policy strictly against AISLIC, the insurer (the doctrine of *contra proferentem*). Cf. *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.*, 19 F.3d 78, 81 (2d Cir.1994). The Court finds that the application of *contra proferentem* to this case is inconsistent with the law and the Policy. The KPMG opinions and Shareholders Agreement that Upper Deck asks the Court to construe strictly against AISLIC are documents that Upper Deck (but not AISLIC) had a role in drafting. *See Standard & Poor's Corp. v. Cont'l Cas. Co.*, 718 F.Supp. 1219, 1221 (S.D.N.Y.1989) (application of *contra proferentem* "doubtful" where insured had input in drafting of the disputed provision). The KPMG opinions were prepared by KPMG at Upper Deck's request, and the Shareholders Agreement was signed by representatives of Upper Deck, the MPR Trust, and the charity. Furthermore, the Policy's provision on arbitration and choice of law specifically directs that the Policy "shall be construed ... without regard to the authorship of the language and without any presumption in favor of either party." (Policy § 16.) The panel's failure to apply this doctrine was a plausible interpretation

§ 1 without regard to fair market value. The absence of a reference to § 1 supports the inference that the parties did not intend § 1

to be a freestanding basis for Upper Deck to repurchase the shares.

of the Policy, and, because the interpretation was plausible, it would be legal error for the Court now to apply the doctrine to reach a different outcome.

Therefore, the arbitrators acted within their authority by holding that Upper Deck "abandoned the Shareholders Agreement underlying the tax strategy the Policy insured and materially impaired the underpinnings of a defense of that tax strategy before the IRS or otherwise." (Award, at 4.) If Upper Deck did not repurchase the shares at fair market value, it risked creating a second class of stock. If Upper Deck had a second class of stock, it risked losing its status as an S corporation. By repurchasing the shares at one-fifth of their fair market value, Upper Deck abandoned the SC2 strategy that had a 70% chance of prevailing on the second class of stock issue and essentially left Upper Deck without a defense before the IRS or FTB.

Even if Upper Deck abandoned the SC2 strategy by repurchasing below fair market value, its counsel contended at oral argument that a repurchase in December 2002 could not breach a warranty that "facts, assumptions of fact, and understandings of fact" in KPMG's opinions were true and correct on the date of the opinions (May 2, 2001) and the date of the Representation Letter (September 4, 2001). The Court rejects this argument in light of KPMG's extensive discussion of how the anticipated repurchase of the shares at fair market value would not run afoul of the IRS's prohibition against a

second class of stock in an S corporation. Indeed, the discussion of the put option—which did not take effect until April 1, 2003—belies the notion that events after the date of the Representation Letter had no bearing on the warranty in the letter. Plausibly interpreting the warranty, one "assumption" or "understanding" in the KPMG opinions was the fact that, when Upper Deck repurchased the shares from the charity at some point down the road, the transaction would take place at fair market value. When the shares were repurchased for a comparatively paltry $2 million in December 2002, Upper Deck breached the September 2001 warranty that, when the repurchase eventually took place, Upper Deck would pay fair market value. In other words, the "assumption" or "understanding" in September 2001 that Upper Deck would someday repurchase at fair market value was proven false and incorrect when Upper Deck paid less than fair market value in December 2002.[6]

██ Under New York law, a breach of warranty precludes insurance coverage if " 'such breach materially increases the risk of loss, damage or injury within the coverage of the contract.' " *Anjay Corp. v. Those Certain Underwriters at Lloyd's of London subscribing to Certificate No. HN01AAF4393,* 33 A.D.3d 323, 822 N.Y.S.2d 249, 251 (N.Y.App.Div.2006) (quoting *Cont'l Ins. Co. v. RLI Ins. Co.,* 161 A.D.2d 385, 555 N.Y.S.2d 325, 327 (N.Y.App.Div.1990)). The breach—*i.e.,* the repurchase of shares at much less than

---

**6.** The Court declines to parse the language of the warranty to determine whether it is an "affirmative" or "promissory" warranty under the distinction drawn by nineteenth-century New York cases. (*See* Pls. Memo. ISO Motion to Vacate, at 14 n. 11.) Instead, the Court relies on New York's contemporary definition of "warranty" as "a promise by the insured to do or not do some thing that the insurer considers significant to its risk of liability under an insurance contract." *Hartford*

*Fire Ins. Co. v. Mitlof,* 208 F.Supp.2d 407, 411 (S.D.N.Y.2002) (citing *Comm. Union Ins. Co. v. Flagship Marine Servs., Inc.,* 190 F.3d 26, 31 (2d Cir.1999)). Here, Upper Deck warranted that it would not violate KPMG's "assumption" or "understanding" that Upper Deck would eventually repurchase the shares at fair market value. The panel plausibly found that, by paying far below fair market value, Upper Deck breached that warranty.

fair market value—materially increased the risk of loss in this case because Upper Deck no longer had at least a 70% chance of prevailing if the IRS raised the second class of stock issue. Therefore, the panel plausibly cited the breach of warranty as a basis for its declaration that Upper Deck was not entitled to coverage under the Policy.

*2. Policy Exclusion*

■ The Policy excludes coverage for a loss "arising out of, based upon or attributable to any material inaccuracy in the facts set forth or referenced in the Representation Letter." Policy § 3(b). The panel found that the December 2002 repurchase rendered false the facts and assumptions in the Representation Letter and, therefore, Upper Deck was properly denied coverage under this exclusion. (Award, at 4.)

For the reasons discussed *supra*, the panel plausibly found the facts referenced in the Representation Letter—specifically, the "facts, assumptions of fact, and understandings of fact" in the KPMG opinions— were materially inaccurate. The KPMG opinions inaccurately assumed and understood that Upper Deck would eventually repurchase the shares at fair market value. That factual inaccuracy was material because it put Upper Deck at risk of creating a second class of stock.

■ On the question of whether Upper Deck's loss was "arising out of, based upon or attributable to" this material inaccuracy, the Court defers to the Ninth Circuit's rule that, as long as the panel is interpreting the contract, the Court may not vacate the award merely because it would interpret the contract differently. *Haw. Teamsters & Allied Workers Union, Local 996 v. United Parcel Serv.*, 241 F.3d 1177, 1183 (9th Cir.2001) (discussing *United Steelworkers*, 363 U.S. at 599, 80 S.Ct. 1358); *Ass'n of Flight Attendants, AFL–CIO v. Aloha Airlines, Inc.*, 158 F.Supp.2d 1200,

1205 (D.Haw.2001). According to the coordinated issue paper, the IRS challenged the SC2 strategy, *inter* alia, as a violation of the second class of stock rule. (Pls. Exhibit G, at 123–25.) Specifically, the IRS found that the warrants (*see* footnote 1 *supra*) created a second class of stock and the redemption agreements "ensure[d] that the purchase price, while purportedly at fair market value, reflect[ed] a price substantially below that to be expected for shares reflecting 90 percent ownership of the S corporation." (Pls. Exhibit G, at 125.) A fair reading of this language from the coordinated issue paper suggests that even a repurchase of the shares at nominal "fair market value" ordinarily would have violated the second class of stock rule.

At the arbitration, however, Ms. Linda Burke, IRS operating division counsel during the 2000–03 period, testified that, in this case, "had the transaction as structured proceeded ... I think the odds of [Upper Deck's] winning the litigation [against the IRS] would have been good." (Trans., at 488:12–17.) In light of testimony that Upper Deck could have prevailed on the second class of stock issue if it repurchased the shares at appraised fair market value, the Court must not vacate the panel's determination that the Policy exclusion barred coverage. The panel plausibly concluded that the loss was "arising out of, based upon, or attributable to" the December 2002 repurchase at one-fifth of fair market value, which, in turn, rendered materially inaccurate the facts (from the KPMG opinions) referenced in the Representation Letter. Where an exclusion applied, AISLIC was not liable to provide coverage. Policy § 3. The exclusion was another plausible basis for the panel's declaration that Upper Deck was not entitled to coverage under the Policy.

*3. "Insured Tax Loss"*

The Policy insures "the Loss of the Insureds arising from a Claim[.]" Policy § 1. A "Loss" is defined, *inter alia,* as 90% of an "Insured Tax Loss." *Id.* § 2(*l*). An "Insured Tax Loss" is defined as "any Taxes, Interest, fines or penalties owed by any Insured to a Taxing Authority directly related to the Insured Tax Event, subject to all of the terms, conditions and exclusions of the Policy." *Id.* § 2(j). As discussed *supra,* where an exclusion applies, AISLIC has no obligation to make payments for any claimed Insured Tax Loss. *Id.* § 3.

██ Because the panel plausibly concluded that an exclusion applied, it concluded there was an absence of an "Insured Tax Loss." (Award, at 4.) The award was a plausible interpretation of Policy §§ 2(j) and 3, which precluded coverage for losses where an exclusion applied. *See Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.,* 249 F.Supp.2d 303, 325 (S.D.N.Y.2003), *vacated on other grounds sub nom Mirasco, Inc. v. Am. Nat'l Fire Ins. Co.,* 144 Fed. Appx. 171 (2d Cir.2005) (insurer not liable for losses excluded from coverage). The absence of an "Insured Tax Loss" was another plausible basis for the panel's declaration that Upper Deck was not entitled to coverage under the Policy.

*4. Condition Precedent*

██ One condition precedent of the Policy is that plaintiffs "shall have prepared and filed all applicable Tax Returns in a manner materially consistent with that anticipated by the Opinions and/or the Representation Letter." Policy § 9(b). The panel squarely held:

McWilliam did not even file his tax returns in a manner consistent with the SC2 strategy as required by Paragraph 9(b) of the Policy: He failed to record his alleged charitable contribution to [the charity] while nonetheless attempting to "shelter" income by allocating 90% of it to this tax-exempt entity.

(Award, at 4.) By citing the specific provision, this portion of the panel's award unambiguously construed the Policy. Therefore, the law would ordinarily require the Court to confirm the award and reject Upper Deck's explanation why McWilliam's 2001 tax return was materially consistent with the KPMG opinions and Representation Letter. *See Barnes,* 122 F.3d at 822 (requiring court to confirm award where panel acted within its authority by construing the contract); *Goodman,* 131 F.Supp.2d at 1183 (same).

Besides disagreeing with the panel's substantive interpretation of § 9(b), however, Upper Deck also asserts that AISLIC waived the condition precedent defense by failing to raise it in the July 29, 2005 letter denying coverage. (*E.g.,* Pls. Memo. ISO Motion to Vacate, at 19, 24.) The panel's award made no mention of waiver in its determination that McWilliam's 2001 tax return did not comply with the condition precedent. Therefore, Upper Deck argues for vacatur because the panel manifestly disregarded New York law on waiver.

██ For a reviewing court to find manifest disregard of the law, " '[i]t must be clear from the record that the arbitrators recognized the applicable law and then ignored it.' " *Carter v. Health Net of California,* 374 F.3d 830, 838 (9th Cir.2004) (quoting *Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.,* 44 F.3d 826, 832 (9th Cir. 1995)). " 'The governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable.' " *Id.* (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 934 (2d Cir.1986)).

██ The Court finds the panel did not manifestly disregard New York law on

waiver because Upper Deck has failed to carry its burden of showing that the law, as presented to the panel, was sufficiently "well defined, explicit, and clearly applicable." *Carter*, 374 F.3d at 838. Under New York law, where an insurer asserts any defense(s) to coverage and, at the time, has actual or constructive knowledge of circumstances regarding an unasserted defense, the insurer waives the unasserted defense. *New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1431–32 (2d Cir. 1991); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Travelers Indem. Co.*, 210 F.Supp.2d 479, 484–85 (S.D.N.Y.2002). Upper Deck directs the Court to two citations to *AMRO Realty* in its arbitration reply brief. (Pls. Memo. ISO Motion to Vacate, at 19 (citing Pls. Exhibit P, at 381, 395).[7]) However, each citation claimed that *AMRO Realty* stood for the proposition that an insurer waives any defense not asserted it in the letter denying coverage. This is not a complete statement of New York law, especially as applied to these facts. Waiver is "a voluntary and intentional relinquishment of a known right," and a finding of irrevocable waiver requires "full knowledge of all the facts" by the insurer. *AMRO Realty*, 936 F.2d at 1431 (internal quotations omitted). When AISLIC denied coverage by letter dated July 29, 2005, its position was "dictated and based on the very limited information AISLIC has at hand." (Pls. Exhibit D, at 101.) If Upper Deck or McWilliam contested the denial of coverage, AISLIC specifically reserved its right to supplement its reasons for denying coverage based on additional information. (*Id.*) AISLIC mentioned Upper Deck's failure to provide assistance in identifying documents AISLIC specifically requested within a "mass" of documents that Upper Deck supplied to the IRS. (*Id.* at 96.)

The panel's failure to apply Upper Deck's overly broad statement of New York's waiver doctrine is not manifest disregard of the law. While Upper Deck documents admitted into evidence indicated Upper Deck provided McWilliam's 2001 tax return to AISLIC (Supp. Wahquist Decla., Exhibits DD & EE), Upper Deck has failed to show it clearly explained these documents satisfied *AMRO Realty's* knowledge requirement. In other words, while Upper Deck presented the panel with the law (*AMRO Realty*) and the facts (the documents in the Supplemental Wahlquist Declaration), Upper Deck has not persuaded the Court that it correctly applied the law to the facts before the panel. Therefore, the law allegedly ignored by the panel was not "well defined, explicit, and clearly applicable."[8] *Carter*, 374 F.3d at 838.

Plaintiffs' failure to satisfy a condition precedent provides a fourth and final plausible basis for the panel's declaration that

**7.** The Court disregards Upper Deck's citation to a reference to waiver in its post-hearing arbitration brief, as that reference mentions no case law. (*See* Pls. Exhibit R, at 367 & n.C.)

**8.** Alternatively, a finding that the panel manifestly disregarded the law is inappropriate because the reviewing court cannot second-guess the weight the panel assigns to conflicting evidence in resolving factual disputes. *Coutee*, 336 F.3d at 1134; *Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1026 (9th Cir.1991). A plausible interpretation of the panel's failure to mention waiver in its award is that the panel assigned more weight to AISLIC's reservation of rights in its denial of coverage letter than to the documents purportedly establishing that Upper Deck turned over McWilliam's 2001 tax return to AISLIC. Where the panel did not explicitly find that AISLIC knew about the failure to comply the condition precedent when it denied coverage, the panel did not manifestly disregard the law on waiver because knowledge of the unasserted defense is a prerequisite for a finding of waiver.

Upper Deck was not entitled to coverage under the Policy. Because the policy's definition of an "Insured Tax Loss" is subject to Policy conditions (Policy § 2(j)), the panel's finding that McWilliam failed to file his tax returns in the manner prescribed by Policy § 9(b) bolsters the panel's conclusion that there was no "Insured Tax Loss" in this case.

## CONCLUSION

Good cause appearing, the Court **LIFTS** the stay in this action nunc *pro* tunc to March 15, 2007, the date of the Court's notice of hearing for dismissal for want of prosecution pursuant to Local Rule 41.1. The arbitration panel's award drew its essence from the Policy and plausibly interpreted the Policy. Furthermore, the award did not manifestly disregard the law. Therefore, the Court **GRANTS** defendant's motion to confirm the arbitration award and **DENIES** plaintiffs' motion to vacate the arbitration award. The Clerk of the Court **SHALL ENTER** judgment for defendant confirming the arbitration award. This Order **CONCLUDES** the litigation in this case.

**IT IS SO ORDERED.**